NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PAUL KAMIENSKI, | |
| Petitioner, | Civ. No. 02-03091 (SRC) |
| v. | |
| | **OPINION** |
| ROY HENDRICKS, Administrator, New Jersey State Prison, | |
| Respondent. | |

**CHESLER**, District Judge

This matter comes before the Court on Petitioner Paul Kamienski's motion for reconsideration [docket #36] of the Order and Order and Opinion in this matter signed by the Court on May 10, 2005.

**BACKGROUND:**

The relevant facts and procedural history of this case are well-known to the parties and will not be repeated here except as pertinent to the instant motion for reconsideration.

Petitioner filed a petition for a writ of habeas corpus on June 26, 2002. On October 15, 2003, Petitioner filed an amended and supplemental petition.

In an Opinion and Order dated May 10, 2005 this Court ordered that (1) Petitioner's amendments of Grounds One Two, Three, and Four will be treated as if they were filed at the time of the original petition; (2) Petitioner's Ground Five for Brady-Giglio Violation Re FBI Lab

Documents and his Ground Six for Ineffective Assistance of Counsel are both dismissed as they are time-barred pursuant to 28 U.S.C. § 2244(d)(1); (3) the filing date of Petitioner's Amendment and Supplement to his petition remains October 15, 2003; and (4) the Court will not entertain any requests for discovery until after Respondent has answered the petition.

Petitioner contends that the Court, in reaching these conclusions, made certain erroneous findings and overlooked several factual matters and legal arguments.  Specifically, Petitioner appears to be challenging the Court's dismissal of Ground Five for Brady-Giglio Violation Re FBI Lab Documents.

**DISCUSSION:**

**I.  Standard of Review:**

Motions for reconsideration are governed by Local Rule 7.1(i).[1]  That Rule provides, in part, that "[a] motion for reconsideration shall be served and filed within 10 business days after the entry of the order or judgment on the original motion by the Judge or Magistrate Judge."  D.N.J. L. Civ. R. 7.1(i).  The "purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence."  Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985).

Reargument is not a means by which to obtain a proverbial second bite of the apple.  See Chiniewicz v. Henderson, 202 F. Supp. 2d 332, 334 (D.N.J. 2002) (noting that a motion for

---

[1] The cases cited below refer to Rule 7.1(g).  However, Local Civil Rule 7.1 was amended on February 24, 2005 so that Motions for Reconsideration are now governed by Local Rule 7.1(i) instead.  Substantively, for purposes of this Opinion, the amendments to the Rule are of no consequence.

reconsideration "is not an opportunity ... to introduce legal theories that a party failed to include in its initial motion"). Indeed, Rule 7.1(i) permits a reconsideration only when "dispositive factual matters or controlling decisions of law" were presented to the Court but were overlooked. See Resorts Int'l v. Great Bay Hotel and Casino, 830 F. Supp. 826, 831 (D.N.J. 1992); Khair v. Campbell Soup Co., 893 F. Supp. 316, 337 (D.N.J. 1995). Accordingly, the Court has reconsidered its previous rulings only where convinced that germane information was initially overlooked.

Relief pursuant to Rule 7.1(i) is "an extraordinary remedy" that is to be granted "very sparingly." NL Indus. Inc. v. Commercial Union Ins. Co., 935 F. Supp. 513, 516 (D.N.J. 1996); Maldonado v. Lucca, 636 F. Supp. 621, 630 (D.N.J. 1986). Indeed, "mere disagreement with a court's decision normally should be raised through the appellate process and is inappropriate on a motion for reargument." Yurecko v. Port Auth. Trans. Hudson Corp., 279 F. Supp. 2d 606, 609 (D.N.J. 2003) (quotation and citation omitted).

Accordingly, a motion under Rule 7.1(i) may be granted only if: (1) an intervening change in the controlling law has occurred; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or prevent manifest injustice. North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir 1995).

**II. Factual Findings:**

Petitioner points out several factual statements made in the Court's opinion that he claims were mistaken. Specifically, Petitioner contends that the Court: (1) incorrectly stated that the FBI performed tests on hairs taken from Kamienski along with fibers and hairs from Kamienski's

3

boat (Pet. Br. for Recons. at 7); (2) mistakenly stated that the Podolak notes concluded that no transfer of textile fibers between the rug on Kamienski's boat and the blankets wrapped around the victims was detected, when the rug was actually from Alongi's boat (Id.); (3) understated the significance of the Podolak notes as set forth in Presley's declaration by failing to mention Presley's conclusion that the two blankets had been in contact with the victims prior to the homicides and that the two blankets had been stored in the victims' own car rather than Kamienski's boat (Id. at 8); and (4) did not discuss or give appropriate weight to the many other aspects of the Podolak notes that Presley deemed significant (Id. at 8-9).

The Court now recognizes that some of Petitioner's factual clarifications are indeed correct. The Court's opinion did indeed incorrectly state that Petitioner's Brady claim relied on the FBI tests performed on "hairs taken from the two victims, *hairs taken from Kamienski*, and tests on blankets wrapped around the victims, as well as two blankets from Kamienski's boat, along with various fibers and hairs *from Kamienski's boat* and the victims' car." (Opinion at 12 (emphasis added)). The Opinion also incorrectly stated that the Podolak notes concluded that "no transfer of textile fibers between the *rug on Kamienski's boat* and the blanket wrapped around one of the victims was detected." (Id. at 13 (emphasis added)). Upon further consideration, the Court recognizes that there is no evidence that any tests were ever performed on hairs taken from Kamienski, nor were any fibers, hairs, or rugs taken from Kamienski's boat.

However, the Court believes that this correction, if anything, hurts Petitioner's position. The Court had assumed that more tests were done which tended to show a lack of connection between Kamienski and the victims. As Petitioner correctly points out, however, there could not have been any tests done by the FBI to attempt to connect Kamienski's hair or his boat to the

4

victims, because the FBI did not take any samples from Kamienski or his boat. At the very least, the fact that Petitioner's hair was not tested does not help Petitioner's argument that the FBI had Brady materials showing that he was not connected to the blankets found on the victims.

Furthermore, while the Court recognizes that there were some points in the opinion in which the Court confused Kamienski's boat with that of Alongi, the Court is convinced that it correctly referred to Kamienski's boat in the only context in which it actually mattered. Specifically, during Detective Thompson's cross examination, Kamienski's trial counsel asked if the State was capable in 1983 of going to Kamienski's boat to determine if the blankets wrapped around the victims came from that boat. (Opinion at 14).[2] It is true that Detective Thompson responded that he was capable but did not actually take any samples nor do any tests on Kamienski's boat. However, soon afterward, the testimony discussed the blankets that were tested as well as the "extensive list" of items sent to the FBI for testing. Significantly, this was all in the context leading up to Thompson's ultimate conclusion that nothing the FBI had done or tested served to connect Kamienski to the victims.

Petitioner's contentions that the Court understated the significance of the Podolak notes as interpreted by Presley appear to stem from Petitioner's mischaracterization of Detective Thompson's testimony. The testimony cited in the opinion was the following cross examination of Detective Thompson by Kamienski's attorney, Thomas J. Cammarata:

> Q. Suppose for example these blankets came from a boat such as depicted in 28 and 29 for identification, [Kamienski's boat] and they were inside, in the

---

[2] Petitioner has conceded that the boat in this context is certainly that of Kamienski. The boat here was referred to as "28 and 29 for identification" (Opinion at 14). Petitioner referred to Kamienski's 40-foot yacht as being "depicted in photographs at trial as exhibits S-28 and S-29" (Pet. Br. for Recons. at 5).

5

enclosed area of this boat.  You were capable, in October of 1983, of going to that boat and doing your testing and attempting to determine whether in fact there was anything on that boat which would scientifically prove that these two blankets, 11a and 11b, came from that boat?  You were capable of doing that, weren't you?
      A.  Yes sir.
      Q.  And you were never asked to do that?
      A.  That's correct sir.
      Q.  Well you sent a number of items to the FBI for testing; is that correct?
      A.  That is correct, sir.

(Trial Trans. 5T 98-22 to 99-11).

    . . . .

      Q.  Now, let me show you DK-1 for identification, which is a letter dated October 13th, 1983, and ask you, do you recognize that?
      A.  Yes.  This is the letter that I offered.
      Q.  Okay.  And this is a letter, as I said, dated October 13th, 1983, and it is directed to the FBI Laboratory, is that correct?
      A.  That is correct.
      Q.  And what you were basically doing in this letter is submitting a list of items for analysis by the FBI Lab?
      A.  That is correct.
      Q.  And what were you looking for at this time?
      A.  *We were looking for a cross match of fibers, hairs*, possible blood, and an identification, I believe, of the projectiles.
      Q.  How many blankets did you submit to the FBI on October 13th, 1983; do you remember?  Or if you need this –
      A.  I would have to refer to the report.
      Q.  You can just read it to yourself.

(5T 100-9 to 101-3) (emphasis added) (the Court notes that while Detective Thompson never ended up answering the question about how many blankets were submitted, exhibit DK-1 reveals that one rust colored blanket taken from each of the victims was submitted, and that two reddish brown color blankets received from Kamienski were submitted as well (see Resp. Exh. RA 49-52)).

    . . . .

      Q.  Detective Thompson, I think I left off asking you, or I started to ask you questions about DK-1 for identification.  And did you have a chance – or take a minute to look at that, if you will.
      THE COURT.  All right, Mr. Cammarata.

>         Q.  Now, that lists all of the items that you sent to the FBI Lab on October 13th, 1983; correct?
>         A.  That's correct, sir.
>         Q.  And it's a pretty extensive list, would you say?  It has at least some approximately fifty items; correct?
>         A.  That's correct.
>         Q.  *And what you were doing, so it's clear is, you were sending items that you collected during the course of this investigation and your participation in the investigation, such as hair samples, fingernail scrapings, things you took off the boat that you described, and you were sending them to the FBI so that the FBI could do a comparison for you; correct?*
>         A.  *That is correct sir.*
>         Q.  *And what you were trying to do is get comparisons between items, for example, taken off the boat, and items found on the victim, such as hair or whatever; correct?*
>         A.  *That is correct, sir.*
>         Q.  *And as I understand it, everything that you submitted came back negative; correct?*
>         A.  *That is also correct.*
>         Q.  *So that when we say it came back negative, there were no comparisons that were able to be made; correct?*
>         A.  *That is correct.*
>         Q.  *And that would be really true of* everything *that you sent to the FBI with regard to this* entire *investigation; correct?*
>         A.  *That is also true.*

(5T 103-23 to 105-8)(emphasis added) (see also, Opinion at 14-16).

Petitioner argues that the cited Thompson testimony was merely an acknowledgment that "the FBI forensic tests as to whether Alongi's small motor boat was connected to the murders were inconclusive (in his words, 'negative')." (Pet. Br. for Recons. at 4).  This characterization is flawed for several reasons.  First, Cammarata had just clarified that Thompson sent items collected during the course of the investigation, including the blankets wrapped around the victims and those submitted by Kamienski,[3] so that the FBI could attempt to show comparisons

---

[3] These blankets are clearly included in the items that Thompson "collected during the course of this investigation" and sent to the FBI for testing (See "DK-1" at Resp. Exh. RA 49-

between the items. Therefore, to say that Thompson's reply referred only to Alongi's small motor boat is simply not accurate.

Additionally, the testimony here was that the State wanted to "get comparisons between items" but that "there were no comparisons that were able to be be made" and that therefore, "everything [they] submitted came back negative." This is not testimony of an "inconclusive" result, as Petitioner characterizes it. This is clearly testimony that tests were done for the express purpose of showing comparisons between various objects with the result being that those objects could not be compared to one another. A test of this nature is not conclusive only if it shows that comparisons can be made; rather, it can conclusively find that no comparison can be made between the items. Petitioner's interpretation of this testimony would invariably lead to the conclusion, for example, that if Kamienski's DNA were tested for comparison to DNA on the victims' blankets, and the testimony was that they could not be compared, the "negative" result would mean that the test was "inconclusive." Such an interpretation is logically unsound. Rather, the testimony that no comparisons could be made was a statement that the conclusive FBI results could show no connection between anything taken from any of the suspects and anything taken from either of the victims. Furthermore, Petitioner cites the transcript at T4, p.53:10-13[4] for the proposition that Thompson testified that "the FBI reports concluded there was insufficient questioned evidence recovered from Alongi's boat (in the form of blood, hair and fibers) to make

---

52). Furthermore, the Court notes that those blankets were discussed immediately prior to these questions.

[4] The only transcript provided to the Court is titled 5T, so the Court assumes that this was a typo in Petitioner's brief, because the substance cited to in 5T is clearly what Petitioner is referring to.

8

any meaningful comparisons with the known evidence obtained from the victims and the crime scene. (Pet. Br. for Recons. at 4). In fact, lines 3-13 on page 53 of that transcript read as follows:

> Q. Okay. I'm talking about the fibers, for example, and let me just ask, did you ask the FBI to analyze if fibers of this blanket and fibers of the sleeping bag were the same fibers that you found six months – these microscopic fibers that you found six months later on that vessel?
> A. Yes, we did, sir.
> Q. And what did their report indicate on that point?
> A. There was either insufficient quantities for analysis, or there was no match made.

(5T 53:3-13). Although Petitioner chose focus only on the words "insufficient quantities for analysis" in this testimony and ignore the rest of that sentence, the Court recognizes that Detective Thompson did indeed testify as well that no matches were made.

Petitioner argues that the Court overlooked the fact that Presley's expert opinion goes further than merely concluding that the blankets wrapped around the victims were not from Kamienski's boat, stating also that they were actually "most likely" from the victims' own car. (Pet. Br. for Recons. at 8). While this is indeed what Petitioner's expert has opined, it does not change the Court's conclusion that Petitioner was put on notice of any such potentially exculpatory Brady materials by Detective Thompson's testimony. It is clear that Kamienski's trial counsel, and the Court bears in mind that it was Kamienski's own trial counsel conducting this cross examination, understood Thompson's testimony to mean that the FBI forensic tests could not connect Kamienski, or any other defendant, to the victims. This is evident from his follow-up question to Detective Thompson's acknowledgment that all testing had come back negative. Kamienski's lawyer asked "[a]nd that would really be true of *everything* that you sent

9

to the FBI with regard to this *entire investigation*; correct?" to which Thompson replied, "[t]hat is also true."  ((5T 103-23 to 105-8)(emphasis added) (see also, Opinion at 14-16)).  Thompson's testimony that the forensic testing could not connect Kamienski to the victims put Petitioner on sufficient notice that if he wanted to find out the details of those tests and their results to try to hypothesize as to where the blankets originated, he should have asked for them sooner.

In short, Petitioner's knowledge of the failure in the FBI's forensic tests to establish a positive correlation between the defendants and the victims put Petitioner on notice that further investigation might yield positive results for him.  Petitioner put it best in his brief, when he conceded that

> At most, Kamienski had knowledge that (1) two blankets provided by him, along with other crime scene evidence, had been submitted to the FBI for hair and fiber testing, (2) certain forensic tests relating to Alongi's boat had come back inconclusive, and (3) a petroleum distillate test on the recovered towel was negative and potentially exculpatory. *The combination of this information certainly would have caused reasonable trial counsel to anticipate test results relating to the subject matter of the Podolak Notes*.

(Pet. Br. for Recons. at 12) (emphasis added).  While Petitioner couches this statement with the words "at most," he does not and cannot dispute the fact that Kamienski had knowledge of all of that information prior to, or during trial.  As he acknowledges then, he certainly should have anticipated the test results relating to the subject matter of the Podolak notes.  Yet, he did not file his Brady claim in a petition for habeas corpus within one year of discovering this information, and it was thus untimely.

Therefore, although the Court recognizes that its opinion included several mistakes of fact, this itself is insufficient to warrant a reconsideration of the Opinion and Order, as the errors were not dispositive of the Court's legal conclusions.  See, e.g., Resorts Int'l v. Great Bay Hotel

and Casino, 830 F. Supp. 826, 831 (D.N.J. 1992) (reconsideration should be granted only when "*dispositive* factual matters or controlling decisions of law" were presented to the court but were overlooked.) (emphasis added); Holzman v. The World Book Co., Inc., 2001 WL 1450599 (E.D. Pa. Nov. 13, 2001) ("Despite the discovery of a mistake of fact, 'the Court can only disturb its prior ruling if the newly apparent facts would alter the Court's legal conclusions.'").

### III. Overlooked Legal Arguments:

Petitioner also asserts that the Court's opinion overlooked two "critical and interrelated legal arguments" on his behalf. The first argument was that the State had an affirmative duty under Brady to seek out exculpatory evidence in related investigative files and produce it to the defense. The second was that Petitioner's trial attorney had the right to reasonably rely on the State's representations that it had produced all relevant evidence, and Petitioner should therefore be excused for failing to bring his Brady claim earlier.

Petitioner contends that the Court's opinion "does not address Kamienski's contention, based on Kyles v. Whitley, 115 S.Ct. 1555, 1565-68 (1995), U.S. v. Perdomo, 929 U.S. 967, 970-71 (3d Cir. 1991) and other authority, that the State had an affirmative duty under Brady to seek out all exculpatory evidence in related investigative files – including the Podolak Notes – and to produce it to the defense." (Pet. Br. for Recons. at 10). Petitioner is correct that the Court did not address this contention in the opinion. The reason, however, is that these cases relate to the underlying merits of Petitioner's Brady claims rather than the statute of limitations issue that the Court was addressing in its opinion. As Petitioner points out, this argument was raised in Petitioner's Sur-Reply Memorandum of Law dated November 30, 2004, item 4 at page 2, which

stated in full, "'OCPO had no independent obligation to seek and produce the Notes because they were in FBI files.' (12, A 12-13) Wrong. Black letter law holds otherwise. Ex. E." Petitioner's Exhibit E4 then accurately summarizes the holding in Kyles v. Whitley, 115 S.C.t 1555, 1565-68 (1995) as follows:

> Prosecutor remains responsible for duty under Brady to disclose favorable evidence to defendant, regardless of whether police investigators failed to inform prosecutor of evidence, as prosecutor can establish procedures and regulations to insure communication of all relevant information on each case to every lawyer who deals with it.

Petitioner's Exhibit E5 then goes on to accurately summarize the holding in U.S. v. Perdomo, 929 F.2d 967, 970-71 (3d Cir. 1991) as follows:

> In determining whether there has been a Brady violation, court's inquiry should not be limited to only the prosecutor's complicity, but should extend to information available to the "prosecution team," including both investigative and prosecutorial personnel.

Even giving full credit to Petitioner's argument based on these cases, the Court could at most find that the State indeed violated its duty under Brady to produce the FBI notes to Kamienski. However, this issue was not before the Court on Petitioner's motion to amend his petition for habeas corpus, as Petitioner first had to demonstrate that he brought this claim within the statute of limitations period. Only then could the Court consider the merits of whether or not the State in fact committed a Brady violation. Therefore, this "overlooked" argument had no bearing on the Court's legal conclusions, and it will not be a basis for reconsideration.

Petitioner next contends that the Court similarly overlooked the

> corollary legal argument, based on Banks v. Dretke, 540 U.S. 668 (2004) (involving a "for cause" exception to the AEDPA's exhaustion requirement and procedural default bar), that Kamienski's trial attorney had the right to reasonably rely on the State's actual and constructive representations that it had produced all

> relevant evidence – including exculpatory material in investigative files – to the defense prior to trial and therefore any failure by Kamienski to use FOIA to obtain the Podolak Notes earlier is excused by the State's conduct on which his attorney reasonably relied.

(Pet. Br. for Recons. at 11).

Petitioner essentially argues that the "State's failure to produce the Podolak Notes, combined with its express and implied representations that all relevant evidence had been produced eliminated trial counsel's need to 'scavenge for hints of undisclosed Brady material,'" regardless of the fact that Petitioner should have anticipated the material's existence. (Id. at 12). Therefore, Petitioner would have the Court conclude that "[u]nder these authorities and under the circumstances of this case, the one year statute of limitations in Subsection D should be tolled *indefinitely* and any claim filed within one year of the 'actual knowledge' of the facts or materials supporting the Brady materials should be deemed timely." (Id.) (emphasis added).

As Petitioner correctly points out, Banks v. Dretke dealt specifically with the "for cause" exception to the EADPA's exhaustion requirement and procedural default rule. 540 U.S. at 692-98. This Court's opinion, however, dealt with the one year statute of limitations for habeas corpus petitions. Specifically, this Court analyzed whether or not Petitioner's Brady claim was filed within one year of "the date on which the factual predicate of the claims presented could have been discovered through the exercise of due diligence." See, 28 U.S.C. § 2244(d)(1)(D). Although it may be true that under Banks, Petitioner might have had "cause" for not bringing his Brady claim in State court, it does not necessarily follow that he the could not have discovered the basis for the claim "through the exercise of due diligence."[5] On the contrary, the Court finds

---

[5] The Court is not determining that Petitioner would in fact have satisfied the "cause and prejudice" standard required to overcome a procedural default, as that issue is not currently

that any non-disclosures and/or assurances made by the State to Petitioner prior to trial do not negate what was clearly revealed to him at trial; specifically, Petitioner's trial counsel's cross examination of Detective Thompson made it inescapably clear that the State's forensic testing showed no connections between Kamienski and the victims. Petitioner's trial counsel therefore had clear notice at that point that the FBI conducted tests, the results of which were favorable to Petitioner. This was not a "connecting-of-the-dots type of notice" as Petitioner would like to characterize it. (See Pet. Br. for Recons. at 12). Rather, Petitioner had clear, unequivocal notice of the existence of the very results he now wants to use to evidence that the blankets wrapped around the victims were not his. To say that "the existence of the Podolak Notes 'could not have been known' at any time prior to the receipt of the FBI FOIA materials, as judged from the perspective of defense counsel exercising reasonable diligence"[6] is thus factually inaccurate. To go further and say that "the one year statute in Subsection D should be tolled indefinitely"[7] under these circumstances is likewise unavailing.

Therefore, this second "overlooked" argument had no bearing on the Court's legal conclusions, and it will likewise not be a basis for reconsideration.

**IV. Actual Innocence:**

Petitioner also seeks to revisit the Court's determination that Petitioner's allegation of "actual innocence" was insufficient to allow review of his time-barred Brady claims.

---

before the Court.

[6] Id.

[7] Id.

To begin with, the Court notes that it gave Petitioner an opportunity to brief the issue of "actual innocence," and Petitioner did so in a brief dated March 15, 2005. Nowhere in Petitioner's current Brief in support of his Motion for Reconsideration does Petitioner suggest that the Court overlooked a dispositive factual matter or controlling decision of law that it had previously presented to the Court on this issue. Rather, Petitioner is attempting to present a new theory as to why the Court should "revisit" the issue of Actual Innocence. The Court assumes therefore that Petitioner must be relying on the "it is necessary to ... prevent manifest injustice" basis for reconsideration.[8]

However, Petitioner's new argument is unpersuasive. Petitioner did not previously, and does not now demonstrate to the Court why it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence." Hubbard v. Pinchak, 378 F.3d 333, 340 (3d Cir. 2004). Petitioner merely suggests that his additional, cumulative, newly discovered evidence mixed with his pre-existing helpful evidence effectively bolsters his claim of actual innocence. (Pet. Br. for Recons. at 13). The jurors heard Detective Thompson's clear testimony, and Petitioner has not shown how his additional evidence, which further "augmented" this testimony, and further hurt witness Duckworth's testimony, would have more likely than not convinced the jury to find him not guilty.

Furthermore, Petitioner has not demonstrated to the Court that he is "factually innocent." See Bousley v. United States, 523 U.S. 614, 623-24 (1998) ("'actual innocence' means factual innocence, not mere legal insufficiency"). At most, he has attempted to attack the credibility of a State witness who had a significant impact on his conviction. This is not the same as

---

[8] See *supra* at 2-3.

demonstrating that Kamienski factually did not commit the crimes for which he was convicted.

In short, Petitioner has not shown that he is actually innocent such that the Court should review his time-barred Brady claim.[9] Furthermore, he has not demonstrated that the Court made a manifest error of law or fact such that it could grant reconsideration on this issue. Therefore, the Court will not reconsider the issue of "actual innocence."

**CONCLUSION:**

For the foregoing reasons, the Court will DENY Petitioner Paul Kamienski's motion for reconsideration [docket #36] of the Order and Order and Opinion in this matter signed by the Court on May 10, 2005.

s/<br>
Stanley R. Chesler, U.S.D.J.

DATED: July 5, 2005

---

[9] As this Court's opinion discussed, there is no Third Circuit precedent as to whether or not there even is an "actual innocence" exception to the EADPA's statute of limitations. While Petitioner seems to be certain that such an exception exists, he has provided no caselaw in this Circuit to support it. Moreover, in the time since this Court's opinion was filed, the Third Circuit has once again explicitly declined to decide whether or not a showing of actual innocence is grounds for equitable tolling of the statute of limitations. See Knecht v. Shannon, 2005 WL 1231956 at 1 n.2 (3d Cir. May 25, 2005) ("This Court has not yet determined whether a showing of actual innocence is grounds for equitable tolling of EADPA's statute of limitations. At least two other Courts of Appeal to consider that question have held that it is. ... As explained, we need not reach that question here.").